**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RICHARD JAMES TATE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-290 |
| | § | |
| RCI, LLC and VALLARTA ADVENTURES | § | |
| SA de CV, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM & OPINION GRANTING VALLARTA'S
MOTION FOR SUMMARY JUDGMENT**

This case arises from a birthday celebration.  Richard Tate and his family traveled from Texas to Puerto Vallarta, Mexico to celebrate his 75th birthday in July 2016.  The celebration he planned and arranged included a zipline and a waterslide excursion.  RCI, LLC was the travel agency that sold Tate the tickets to the excursion; Vallarta Adventures SA de CV was the company that operated the waterslide.  The excursion did not end well.  Tate and another member of his party collided on the waterslide, resulting in Tate breaking his back.  This lawsuit followed.  Tate asserts negligence and gross negligence claims under Texas law.

In March 2018, the court heard argument on the defendants' motions to dismiss for lack of personal jurisdiction and *forum non conveniens*.  The court denied both motions.  RCI and Tate then settled.  Vallarta moved for summary judgment, (Docket Entry No. 46), and Tate moved to defer a ruling on that motion until he had done additional discovery, supplemented the summary judgment record, and responded to the motion.  The court granted Tate's motion.  The discovery is complete, the record supplemented, and the motion for summary judgment is ready for ruling.  The court heard argument on the motion and supplemented record.  Based on the pleadings; the motion, response,

reply; the arguments of counsel and the record; and the applicable law, the court grants Vallarta's motion for summary judgment and, by separate order, enters final judgment. The reasons are set out in detail below.

## I.    Background

RCI is a Mexican company that owns and operates a number of vacation properties and offers vouchers for tours and excursions in the Puerto Vallarta area. One of those offerings is a zipline and waterslide excursion conducted by another company, Vallarta Adventures. Before Tate left Texas for Mexico, he did online research into excursions, including Vallarta's. He also talked to an RCI sales representative about purchasing tickets to Vallarta's excursion. (Docket Entry No. 48-3 at 11). When Tate arrived at the hotel in Mexico, he talked to another RCI representative about the Vallarta zipline excursion. Several days later, Tate went to RCI and bought tickets for the Vallarta excursion, which included an 846-foot tall waterslide. (Docket Entry No. 48-3 at 10, 12). On the day of the excursion, Tate took a bus with his friends and family from their hotel to a dock, where the group boarded a boat, and then a bus that took them up a mountain. At the top, the participants were fitted with safety equipment. (Docket Entry No. 48-3 at 10).

Before the excursion continued, Vallarta gave Tate and the other participants an Acknowledgment of Risk document to review and sign, as well as a safety briefing. (Docket Entry No. 48-2 at 2). Tate does not dispute that he signed the release and waiver sheet on the reverse side of the Acknowledgment of Risk. (Docket Entry No. 48-2 at 2).

Tate argues that he believed the document was a sign-in sheet. "It was Plaintiff's understanding the sign-in sheet was an acknowledgment of the safety rules being recited as the safety equipment was being distributed at the top of the mountain." (Docket Entry No. 55 at 4). He states that no one from Vallarta explained that the "sign-in sheet" was a liability release and waiver,

and that he did not know when he signed that he was agreeing to release Vallarta from liability. (Docket Entry No. 48-2 at 2). Tate states that neither the risks nor the terms of the release were read to each guest and that the release language was not the only language on the sheet. He states that Vallarta allowed only 30 minutes total for the group of 18 people to read and sign the paper.

The Acknowledgment of Risk is one page, with signature blanks on the reverse side of the page. One side is titled "OUTDOOR ADVENTURE Acknowledgment of Risk" and it contains statements about the rules and risks of the excursion. It states, in relevant part:

# OUTDOOR ADVENTURE
## ACKNOWLEDGMENT OF RISK

Please rest assured that we do take all possible care and precautions to make your trip with us enjoyable and as safe as possible, but due to the nature of this tour, you may be exposed to certain inherent risks.

Please read the following points carefully before signing your name, understanding that you participate in this tour at your own risk:

I understand that Vallarta Adventures has taken the necessary precautions to guard my safety and that I participate in this tour at my own risk. Vallarta Adventures is not responsible for any negligence on my part.

I understand that I have to comply with the following guidelines:

. . .

I acknowledge and agree that participation in Vallarta Adventures' Outdoor Adventure Tour may subject me to risk of personal injury and/or damage to property. I represent that I have volunteered for participation in the program and assume all risks in relation thereto. I hereby covenant and agree that Vallarta Adventures, its parent, subsidiaries and affiliated companies and their respective officers, employees and agents ("the released parties") shall not be liable for

3

any damage (including, without limitation, compensatory damages, punitive and exemplary damages, and pain and suffering), losses, or expenses arising from personal injuries and/or damage to property which may in any way result from or arise out of my participation in the program.  I hereby fully and forever release and discharge and covenant not to sue the released parties for any and all claims, demands, damages, rights of action or causes of action, present or future, whether the same be known or unknown, anticipated or unanticipated, resulting from or arising out of my participation in the program.

I acknowledge and agree that if any provision or part of this release shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any provision or part of this release and if any provision or part of this release is capable of two constructions, one of which would render the provision or part void and the other of which would render the provision or part valid, then the provision or part shall have th meaning which renders it valid.

(Docket Entry No. 46 at 10).  The reverse side of the page states at the top, in large, bold, all capitalized letters:

**I HAVE READ AND FULLY UNDERSTAND THIS FORM AND ACCOMPANYING RULES AND INSTRUCTIONS.**

(*Id.* at 11).  This side of the page contains three columns, "Name," "Signature," and "E-mail," followed by a list of names and signatures.  (*Id.*).  Tate wrote his name and signed the sheet in the designated space.  (*Id.*).

Tate went down the waterslide as the Vallarta employees told him to.  His friend, David Lee, followed him down the slide.  While Tate was still in the "figure eight" part of the waterslide, Lee collided with him.  (Docket Entry No. 48-3 at 10–11).  Tate's cervical spine was fractured, among other injuries.  (Docket Entry No. 48-3 at 16).

## II.    Vallarta's Motion for Summary Judgment

The summary judgment record includes the following:

- a declaration by Vallarta's counsel, Hector Antonio Chamlati Salem, (Docket Entry

4

No. 46 at 8);

- an Acknowledgment of Risk form signed by Tate on July 21, 2016, (Docket Entry No. 46 at 10);

- a declaration by Javier Lopez Obeso, a lawyer setting out and explaining applicable Mexican law, (Docket Entry No. 46 at 12);

- an affidavit of Richard Tate, (Docket Entry No. 49-1);

- the deposition of Richard Tate, (Docket Entry No. 48-3);

- a declaration by Jeff John Nelson, a Google "partner," webmaster, and expert, (Docket Entry No. 49-3);

- documents relating to Tate's transaction with Vallarta, (Docket Entry No. 49-4);

- the deposition of Jeronimo Torres Magana, corporate representative for Vallarta, (Docket Entry No. 55-1); and

- Tate's notice of intention to take the deposition of Vallarta's corporate representative, (Docket Entry No. 55-2).

### A.    Tate's Objections to Vallarta's Summary Judgment Evidence

Tate objects to parts of two Vallarta declarations as self-serving, speculative, and conclusory statements or improper legal conclusions.  (Docket Entry No. 55 at 20).  He asks the court to strike those parts from the summary judgment evidence.

### 1.    The Vallarta Adventures Declaration

Tate objects to several statements in paragraph 2 of Hector Antonio Chamlati Salem's declaration.  Salem is Vallarta's attorney.  Paragraph 2 states:

> I have day to day obligations with the corporation that allow me to know the nature of the business operations performed by Vallarta and the record keeping for such operations. I also have personal knowledge of the business and financial records of the corporation in order to be in a position to supervise, and direct such record keeping. I certify that I am a custodian of records for Vallarta. Attached to the Motion for Summary Judgment as Exhibit B is an Acknowledgment of Risk (the "Agreement") executed by Richard James Tate on or

about July 21, 2016 — the date he was injured. The Agreement was entered into in Mexico just prior to Mr. Tate participating in the Excursion. I certify that Exhibit B was kept by Vallarta in the regular course of business, and it was the regular course of business of Vallarta for an employee or representative of Vallarta with knowledge of the act, event, condition, or transaction, to make the record, keep the records, or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. I certify the record attached hereto is the original or exact duplicates of the original.

(Docket Entry No. 46 at 8–9).

Tate argues that this paragraph generally contains inadmissible speculative and conclusory statements. He does not, however, specify which statements he objects to or why they are conclusory, speculative, or self-serving. Tate also argues that "Mr. Salem has no basis to aver that Plaintiff 'entered into' any agreement, or that Plaintiff event [sic] 'executed' the document." (Docket Entry No. 55 at 20–21).

The first part of the paragraph simply states Salem's role in Vallarta's business operations and record-keeping. The second part states that Tate "executed" the attached Acknowledgment of Risk in Mexico, just before he participated in the excursion. It is unclear whether Tate is arguing that the Acknowledgment and Tate's signature are not authentic, or if he objects to Salem's use of the terms "executed" and "entered into." It is unlikely that Salem has personal knowledge that Tate actually signed the Acknowledgment, release, and waiver, but that is not a basis for striking the testimony because it is undisputed that Tate *did* sign. The court does not consider the words "executed" and "entered into," to the extent that they suggest a legal conclusion that Tate signed the release.

### 2. De Obeso's Declaration

Tate also objects to statements in Javier Lopez De Obeso's declaration on the grounds that

they are speculative, conclusory, and call for legal conclusions. Tate objects to paragraph 5, which states:

> After review of the Agreement signed by Plaintiff, it is clear that Plaintiff accepted the release of liability by signing the acknowledgment page on page 2. Additionally, there is nothing illegal about the agreement, the purpose of the agreement, or the Excursion provided by Vallarta. Therefore, it is my expert opinion that the Agreement, according to Mexican law, is a valid, enforceable, and binding Agreement releasing Vallarta from any liability to Plaintiff. Under Mexican law, Plaintiff's claims against Vallarta are barred as a matter of law and agreement.

(Docket Entry No. 46 at 14). Tate objects to the statement that "Plaintiff accepted the release of liability by signing the acknowledgment page," because De Obeso has no personal knowledge of whether Tate signed the document, much less that he understood it or consented to its terms. Again, it is undisputed that Tate signed the document. To the extent that De Obeso is stating that Tate *subjectively* understood and consented to the release, he has no way to know that, and the court does not consider it.

Tate also objects to the statements that the release and waiver agreement is "valid, enforceable, and binding," and that Tate's "claims against Vallarta are barred as a matter of law and agreement," as conclusions of law on the "ultimate issue." Tate argues that De Obeso is not competent to offer those opinions. He is, as an expert on Mexican law. However, a lawyer cannot testify as an expert or fact witness on a legal opinion. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). To the extent De Obeso gives a legal opinion that the waiver and release is valid, the court does not consider the statement.

### B.     The Parties' Arguments

Vallarta argues that Mexican law applies and that Tate's voluntary execution of the Acknowledgment of Risk release and waiver released Vallarta from liability for Tate's injuries. Tate

argues that Texas law applies because it has the most significant relationship to this case. He also argues that the court should deny the motion for summary judgment because Vallarta has failed to show that no genuine issue of fact exists about "whether the release agreement meets the fair notice requirement and otherwise applies to release Vallarta from Plaintiff's claims as a matter of Texas law." (Docket Entry No. 55 at 2). Tate finally argues that, regardless of which law applies, there are factual disputes material to deciding whether: (1) the parties' intent is clearly expressed in the four corners of the Acknowledgment and release and waiver; (2) the document would put a reasonable person on notice of the exculpatory language; (3) the circumstances of signing the release and waiver were procedurally or substantively unconscionable; and (4) Tate actually consented to the release and waiver. (*Id.*).

### C. The Law That Applies

Federal courts sitting in diversity apply the choice-of-law rules of the state in which they sit to determine the substantive law that applies. *See Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770 (5th Cir. 2016) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). The parties agree that Texas choice-of-law rules apply. "Texas follows the Restatement (Second) of Conflict of Laws," *id.* at 771 (citing *Maxus Exploration Co. v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex. 1991)), using the "most significant relationship" test to apply "the 'law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)).

Section 6 lists some of the relevant factors:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* at 771–72 (citing § 6). "In evaluating those factors, Section 188 directs the court to pay particular attention to:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

*Id.* at 772 (citing § 188(2)).

"Under Texas law, a release is a contract, to be interpreted under contract law principles." *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 654 (S.D. Tex. 2003) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997)). The question is which forum has the "most significant relationship" to the Acknowledgment of Risk with the executed release and waiver at issue. *Id.* Tate cites factors that courts consider in a tort context, but these are inapposite in determining the contract issue here.

Vallarta argues that because Tate signed release and waiver was signed in Mexico, the injury and conduct causing the injury occurred in Mexico, Vallarta is located and incorporated in Mexico,

and the relationship between Tate and Vallarta was formed and performed in Mexico, Mexican law applies. *See Zermeno*, 246 F. Supp. 2d at 655 (Mexican law applied to releases negotiated and executed in Mexico before the litigation in the United States began, when the place of performance was "presumably anywhere plaintiffs could have filed suit," the plaintiffs were Mexican citizens and domiciliaries, and the defendants were headquartered in and had a principal place of business in Mexico, then Mexican law applied).

Tate distinguishes *Zermeno* because it involved only Mexican citizens. He argues that Texas has the most significant relationship because he resides in Texas and his relationship with Vallarta began in Texas, when he viewed the Vallarta website before he went to Mexico. This argument is unpersuasive because Tate admits that he did not buy the excursion tickets through the Vallarta website. Instead, he bought the tickets only after he was in Mexico and talked to the RCI representative in Mexico. The relationship between Tate and Vallarta was formed in Mexico.

Tate also argues that Texas has the most significant interest because it has an interest protecting its citizens when Mexican companies solicit tourist business from Texas citizens in Texas. He argues that he is justified in expecting Texas law to apply because it is more protective of American citizens at risk of being taken advantage of by unconscionable, one-sided, and fraudulent releases. Tate argues that Texas law should apply to compensate him because Texas has an interest in protecting access to American courts for American citizens and Mexico's compensation scheme for tort liability is pegged to its standard wages, which do not adequately compensate a Texas citizen.

To the extent these arguments go to the issue of tort liability, not to the contract issue of the validity of the release and waiver, they are unpersuasive. The question is what law applies to specific issues in the case, which include as a threshold matter, the validity of the release and waiver.

*See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 704 (5th Cir. 1999). To the extent these arguments go to access to United States courts, they are questions of venue or *forum non conveniens*, which are not now before the court.

The major difference between this case and *Zermeno* is that Tate is a United States citizen and resident of the forum state. Even so, the balance of factors weighs in favor of applying Mexican law because the release and waiver was signed there, the subject matter of the release—the excursion and accident—occurred there, and Vallarta is a Mexican citizen. Because Tate sued in Texas and is a Texas citizen, those factors weigh in favor of applying Texas law. Both Mexico and Texas have interests in protecting their citizens. Texas has an interest in protecting Texas citizens from "unconscionable" releases and waivers, but Mexico has a superior interest in deciding whether and when a release signed in Mexico, affecting a Mexican company, involving an activity or event that takes place in Mexico, is valid or not. Finally, this court is capable of applying either Texas or Mexican law. The balance of the factors weighs in favor of applying Mexican law. Tate's argument that he was justified in expecting Texas law to apply is unsupported and unpersuasive.

Finally, whether the law that applies is that of Texas or Mexico, Vallarta is entitled to summary judgment because the release and waiver is valid under either.

### D. The Validity of the Release

Tate argues that regardless of which law the court applies, genuine factual disputes exist that are material to determining the enforceability of the release and waiver. Tate's arguments are on questions of law. The material facts are undisputed. Tate admits signing the release and waiver. His arguments that it failed to comply with fair notice requirements under Texas law are legal questions.

The potential factual dispute, which Tate vaguely alludes to, is that he was not given

sufficient time to read the release and waiver or tod what it was. He states that "Vallarta allocates thirty (30) minutes for a group such [his] to each read the terms and all sign the same piece of paper." (Docket Entry No. 55 at 6). That statement indicates that Tate was presented with the Acknowledgment or Risk and the release and waiver form. He alleges that the document—which was in English—was not read to him, but he does not dispute that he was given the document. (Docket Entry No. 55 at 3–4). Tate argues that "the only page of the alleged release agreement that was actually presented to Plaintiff, and which Plaintiff signed, was almost entirely lines for the signature of Plaintiff as well as the entire group of people who were present for the tour." (Docket Entry No. 55 at 17). This argument contradicts Tate's own statement of facts and arguments in his brief. (*Id.* at 3–4). While Tate argues that no staff member specifically said "that the sign-in sheet had a legal document on its reverse side containing a liability release or waiver," (*Id.*) ("Plaintiff never saw the actual release language of the document, which was on the back what [sic] Plaintiff believed was a sign-in sheet."), that indicates, as Tate acknowledges, that he was given the document before he signed it. Tate does not testify that the reservation staff did or did not tell the group to read the paper before signing. He argues that 30 minutes was not enough for all 18 members of the group to carefully read the document but he does not dispute getting the document and signing it. The court has the Acknowledgment of Risk and release and waiver form that Tate admittedly signed.

At oral argument, Tate expanded on his argument that he was given insufficient time to review the release document. He argued that the entire process—for a group of 18 people to review and sign the document, and receive safety equipment—lasted 10 minutes. This is consistent with Tate's admission that Vallarta *allocates* 30 minutes for the process, because Tate testified that the entire process only "lasted" 10 minutes, but not that he was only allowed 10 minutes. (Docket Entry No. 55 at 4, 6, 19; Docket Entry No. 49-1 at 2). The court asked the parties to supplement their

briefing with the best cases supporting their arguments about the validity of the release if the group of 18 participants was only allowed 10 minutes total to review and sign the Acknowledgment of Risk and release and waiver. Tate submitted *Littlefield v. Schaefer*, 955 S.W.2d 272 (Tex. 1997), which addressed whether a "six-paragraph release printed in minuscule typeface on the front of a one-page 'Release and Entry Form' for motorcycle racing satisfies the fair notice requirement of conspicuousness." *Id.* at 272. The court concluded that it did not, because the release and liability language was smaller than 4-point font and illegible, making it "hopelessly unclear" what the signor was releasing. *Id. Littlefield* does not mention how much time the signor had to review and sign the release and does not support Tate's claim that the time he had to review the form was insufficient and made his signature on it invalid. There is no allegation that Tate could not have read the Acknowledgment of Risk and the court finds it perfectly legible.

Vallarta points to *Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 917 (Tex. App.—Dallas 2013, no pet.), and *Thom v. Rebel's Honky Tonk*, No. 01-11-00700, 2013 WL 1748798, at *6 (Tex. App.—Austin, Apr. 17, 2013 no pet.). In *Van Voris*, the plaintiff had signed a similar, one-page release and waiver document, which the defendant asserted as barring the plaintiff's legal claims. In response, the plaintiff testified that he did not have time to read or review the documents that the defendant gave him and that no one explained to him that the documents contained a liability release. The court analyzed, as this court has, the language and typeface of the waiver and release document, finding it to meet the elements of fair notice under Texas law. Without specifically addressing the plaintiff's argument that he had insufficient time to review the document, the court held that the plaintiff had fair notice of the release and waiver. In *Thom*, the plaintiff signed a similar release and waiver document and, like Tate, admitted he signed the release without reading it. 2013 WL 1748798, at *2. The court rejected his arguments that failure to read

was a defense: "Absent fraud, misrepresentation, or deceit, signatory parties are bound by the terms of the contract signed, regardless of whether they read it." *Id.* (citing *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005) (per curiam)). The plaintiff also argued that "he felt rushed into signing the release." *Id.* at *6. The court rejected that argument, noting that the plaintiff claimed he understood what he was signing, despite not reading it, but also that nothing in the record indicated that he was intimidated or forced to sign the document without reading it, nor was there anything to stop him from saying "Hey, hold on a second. I need to read this." *Id.* Although Tate argues the opposite, that he did not understand what he was signing, the outcome is the same. He is bound by the terms of the release and waiver, regardless of whether he read it. He neither submits nor points to any record evidence of fraud, misrepresentation, or deceit. Neither does he point to any record evidence that he was intimidated or forced to sign without reading, or that anything prevented him from saying he needed more time to read the document. To the contrary, Tate argues that Vallarta allocates 30 minutes for the process of reading and signing the document, but that his group only took 10 minutes to do so. This is not a basis on which to hold the release and waiver invalid.

Tate argues that Texas law requires two fair-notice elements for a release of liability, and that the release he signed lacks those elements. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508–08 (Tex. 1993). "To constitute fair notice, a release must satisfy the elements of conspicuousness and the express-negligence rule unless both contracting parties have actual knowledge of the plan's terms, in which case an agreement can be enforced even if the fair notice requirements were not satisfied." *Thom v. Rebel's Honky Tonk*, No. 03-11-00700-CV, 2013 Tex. App. LEXIS 4777, at *8 (Tex. App.—Austin Apr. 3, 2013, no pet.) (citing *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004)). "Express negligence mandates that the intent of the parties seeking to indemnify themselves for their own negligence be specifically stated in the

four corners of the contract." *Id.* at *9. "The test of conspicuousness is 'whether attention can reasonably be expected to be called to it.'" *Id.* at *12 (citing *Quintana v. CrossFit Dallas L.L.C.*, 347 S.W.3d 445, 450 (Tex. App.—Dallas 2011, no pet.)). "A release is conspicuous when a reasonable person against whom a clause is to operate ought to have noticed it." *Id.* at *12–13 (quoting *Dresser*, 853 S.W.2d at 511.

Even if the court applies Texas law, the release at issue meets the two requirements. First, it clearly states that the signor agrees that Vallarta "shall not be liable for any damages" and agrees to "fully and forever release" any and all claims. This demonstrates Vallarta's express intent to indemnify itself. *See Quintana*, 347 S.W.3d at 451–52 (finding similar language of waiving or releasing any and all liability sufficient to satisfy fair notice). Second, the page that Tate signed states in all caps, in a font much larger than the other provisions on the page, "I HAVE READ AND FULLY UNDERSTAND THIS FORM AND ACCOMPANYING RULES AND INSTRUCTIONS." This is conspicuous. It alerts the signor that he should read and understand "this form" and the accompanying rules and instructions. *See id.* (finding large, bold text that is easy to read conspicuous). A reasonable person's attention would be called to that statement. *See also* TEX. BUS. & COM. CODE § 1.201(10) (defining "conspicuous" as including "a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size"); *Quintana*, 347 S.W.3d at 451 (finding that the word "release" near the top of the page in larger type than any other text on the page, and bolded, was conspicuous). Finally, Texas law provides that "[a] party who signs a contract is charged with notice of its contents as a matter of law." *Barker v. Halliburton Co.*, 541 F. Supp. 2d 879, 885 (S.D. Tex. 2008) (citing *D. Wilson Const. Co., Inc. v. McAllen Indep. Sch. Dist.*, 848 S.W.2d 226, 230 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.)). A party's failure to read a contract

incorporated by reference is no defense to enforcing that contract. *Sartre v. Dommert*, 184 S.W.3d 893, 898 (Tex. App.—Beaumont 2006, no pet.). The fact that Tate allegedly did not read the Acknowledgment of the Risk before signing the release and waiver is no defense.

Under Mexican contract law, the release is also valid. "In contrast to the United States and its common law heritage, Mexico's legal system is based on the civil law tradition." *Giner v. Estate of Higgins*, No. EP-11-CV-126-KC, 2012 U.S. Dist. LEXIS 5264, at *15 (W.D. Tex. Jan. 13, 2012) (citing Jorge A. Vargas, MEXICAN LAW FOR THE AMERICAN LAWYER 23–24 (2009); Jorge A. Vargas, *Mexican Law and Personal Injury Cases: An Increasingly Prominent Area for U.S. Legal Practitioners and Judges*, 8 SAN DIEGO INT'L L.J. 475, 485–87 (2007)). "Accordingly, Mexico has 'five basic codes that sustain the legal system.'" *Id.* (quoting Vargas, *Mexican Law for the American Lawyer* at 23). "Two of those codes, the Federal Civil Code and the Commercial Code, generally govern contracts." *Id.* at *15–16 (citing Vargas, MEXICAN LAW FOR THE AMERICAN LAWYER 139; 1 Jorge A. Vargas, MEXICAN LAW: A TREATISE FOR LEGAL PRACTITIONERS AND INTERNATIONAL INVESTORS § 28.1 (1998)). "The provisions Federal Civil Code are the most general." *Id.* at *16 (citing Stephen Zamora et al., *Mexican Law* at 510 (2005)). "Under the Mexican legal system, more specific statutes and codes, like the Commercial Code, override the Federal Civil Code." *Id.* (citing Zamora, *Mexican Law* at 509–10). "For example, commercial contracts are first subject to the more specific rules of the Mexican Commercial Code (Código de Comercio), and then the Federal Civil Code acts 'as supplemental rules to the extent that a matter is not dealt with in the Commercial Code.'" *Id.* (citing Zamora, *Mexican Law*, at 510).

"Mexican law provides that commercial contracts are governed by federal and not state law." *Id.* at *13 (citing Zamora, *Mexican Law* 510 & n.21, (2005)). A contract is commercial if the purpose is business or "between parties engaged in business." *Id.* This release was signed in the

course of a business transaction between Tate and Vallarta. The contract is commercial in nature. Vallarta refers to Jalisco and Nayarit state law in its motion, but the controlling law appears to be Mexican federal law. "Under Mexican law, the elements of a binding contract are (1) consent and (2) an object which can be the subject-matter of the contract." *Id.* (citing Código Civil Federal [CC] [Federal Civil Code], art. 1794 (Mex.); Vargas, MEXICAN LAW FOR THE AMERICAN LAWYER 140).

Vallarta argues that there is no prohibition against liability releases and waivers under Mexican law, and that the object of the Acknowledgment of Risk is a proper subject-matter for a contract. (*See* Docket Entry No. 46 at 13–14, Declaration of De Obeso). There seems to be no dispute that a liability release is the proper subject of a contract. The issue is consent. Vallarta argues that Tate demonstrated his consent by signing the release and waiver. Tate argues that he did not subjectively consent to the terms of the release. He does not dispute that his actions objectively indicated that he manifested his consent.

"The Federal Civil Code prescribes that consent may be express or implied." Vargas, MEXICAN LAW FOR THE AMERICAN LAWYER 141 (citing FCC Article 1803). "Consent is manifested orally, in writing, or by unequivocal signs." *Id.* "Article 1812 of the Federal Civil Code prescribes that '[C]onsent is invalid if given by mistake, obtained by violence or duress or exacted by fraud." *Id.* (alteration in original). Tate does not submit or point to record evidence of any of those circumstances. The undisputed facts show that Tate manifested his consent by signing the release and waiver, clearly stating that he understood the document and the Acknowledgment of Risk and agreed to release Vallarta from liability. The Vallarta corporate representative testified that guests are told to read the form before they sign it and, if they agree, to sign it. (Docket Entry No. 55-1 at 9, 14, 15). The document that Tate was given to read that he signed states in large, capital letters, "I HAVE READ AND FULLY UNDERSTAND THIS FORM . . . ." (Docket Entry No. 55 at 6).

Tate expressly consented by signing this document after he was given it to read and sign. The Acknowledgment of Risk page is short and in English. Not only did the Vallarta employees not mislead Tate about what he was signing, the evidence that they told the participants to read it before they signed. Tate cites no authority requiring that a release and waiver contract must be read out loud or explained.

Based on the summary judgment evidence, under either Texas or Mexican law, Tate consented to the liability release barring his claims. Summary judgment is granted in favor of Vallarta. Final judgment is separately entered.

SIGNED on September 7, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge